**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TODD B. PASSMORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:16-cv-01746** |
| | ) | **Chief Judge Crenshaw** |
| **MAPCO EXPRESS, INC. and** | ) | |
| **DELEK US HOLDINGS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

In this employment case, Mapco Express, Inc. and Delek US Holdings, Inc. have filed a

Motion for Summary Judgment (Doc. No. 25) on Todd B. Passmore's claims of age discrimination

and retaliation. That Motion has been exhaustively briefed[1] by the parties. (Doc. Nos. 26, 33, 41,

45-1). For the reasons that follow, the Motion will be granted in part and denied in part.

## I. Background

In support of their respective positions, the parties have separate statements of material fact,

ostensibly in accordance with Local Rule 56.01. That Rule contemplates the filing of a "concise

statement of the material facts as to which the moving party contends there is no genuine issue for

trial." L.R. 56.01(b). It also provides that "the non-movant's response may contain a concise

statement of any additional fact that the non-movant contends are material and as to which the non-

---

[1] In the context of Passmore's request to file a sur-reply, Magistrate Judge Brown aptly observed that the briefing in this case was "getting out of hand," that "[s]urely, with the excess pages already filed, a surreply is not needed," and that the granting of leave to file one "would undoubtedly only result in a motion for a sur-surreply." (Doc. No. 48 at 1-2). Although Passmore objects to Magistrate Judge Brown's Order, he has not shown that it is clearly erroneous or contrary to law as required by Rule 72(a) of the Federal Rules of Civil Procedure. Nevertheless, the Court has considered Passmore's sur-reply in formulating this opinion.

movant contents there exists a genuine issue to be tried." Id. 56.01(c). The purpose of both provisions is "to assist the Court in ascertaining whether there are any material facts in dispute[.]" Id. 56.01(a).

The parties' filings honor Local Rule 56 more in the breach than in the observance. For a single-employee employment discrimination case, the statements of fact are hardly concise. Combined, the parties offer 154 paragraphs of supposedly undisputed material facts and, when the objections are considered, their statements run 120 pages. What's worse is the parties disagree on the question of whether Mapco underwent a reduction in force, and Passmore disputes even the seemingly straight-forward question of whether Mapco was his sole employer for purposes of his claims.

Because of the way that the facts have been presented, the Court finds it appropriate to deviate from its usual course in ruling on a Motion for Summary Judgment. Instead of attempting to set forth a complete statement of the facts at the outset (which would be unwieldy and require a number of disclaimers), the Court will set forth the most basic facts and then discuss additional material facts as they become relevant to the legal analysis.

The basic facts, drawn from the parties' statements and responses (Doc. Nos. 35, 43) are as follows:

**A.**

Mapco operates convenience stores in several states in the southeastern United States, including Tennessee. Those stores are grouped into districts, and each district has a manager who oversees the operation of all the stores in his or her district. Mapco also groups the districts into divisions, and each division has a division manager.

On November 6, 2009, Passmore signed an offer letter accepting employment with Mapco as a District Manager in Training ("DMIT"). Passmore began his employment with Mapco on January 4, 2010 and, at the time, was 39 years old.

After serving as a DMIT for several months, Passmore was moved into a district manager position in March of 2010. As a district manager, he oversaw the operation of between 9 and 13 stores, with the goal to ensure that they operated at the highest possible profit level.

In 2012, Andrew Heck became the division manager of the Nashville Division, and Passmore reported to Heck. In August of that year, Heck turned 39 years old.

**B.**

Passmore claims that, on various occasions, he complained to Heck that Heck's comments, actions, and/or directions were discriminatory against individuals and Mapco employees of middle-eastern descent. This included a complaint in January 2013 about not allowing foreign cab drivers to park in a store parking lot that was close to the airport, and not allowing Coptic Christian employees at that same store to keep the store's Christmas decorations up in January. In July 2013, Passmore also complained that Mapco's Anti-Money Laundering ("AML") compliance program and testing targeted specific employees in his district because of their ethnicity or national origin. Passmore also claims that at some point in 2013, Heck made comments and/or took other actions that Passmore considered discriminatory against Mapco employees of Egyptian descent, including (1) asking a then-district manager to repeat a joke that Passmore's stores were "Al-Qaeda training grounds," (2) wanting to move a store manager due to the store manager's race and national origin, (3) paying non-Egyptian store managers more in gift cards than Egyptian store managers for covering other stores, and (4) not moving an Egyptian store manager from one store to another

3

because Heck did not want Nolensville Road (where the store was located) run "by a bunch of Egyptians."

In the Nashville Division there were 11 districts identified as District 1A to District 1K. In June 2013, Mapco realigned the Nashville Division and assigned Passmore to District 1C.

In the third quarter of 2013 and leading up to November 2013, there were only nine district managers for the eleven Nashville districts. To fill the two open district manager positions, Heck hired Jan Rakoczy and promoted Garrett Wagner, a Mapco store manager, to serve as DMITs. Although both had to undergo weeks of training before being permitted to run a district, Rakoczy signed an offer letter accepting a district manager position on August 28, 2013, and Wagner did the same on October 2, 2013.

## C.

At this point, the parties' versions of events markedly differs. Defendants claim that, in mid-October 2013, Tony Miller, Mapco's acting president, informed Heck that Heck needed to eliminate a district manager position in the Nashville Division. This was allegedly required as a part of Mapco's move to eliminate a district manager in four divisions (Nashville, Chattanooga, Memphis, and Alabama), plus a loss prevention specialist, as part of budget cuts. Accordingly, Heck gathered financial data for the third quarter of 2013 for purposes of conducting "talent reviews" on the district managers working in his division. Under the category "performance management," the talent review measured "core responsibilities" and "behaviors." To determine the "core responsibilities" portion of the review, Heck created a spreadsheet that measured the financial performance of his district managers for the third quarter of 2013.

With the exception of EBITDA[2] for which Passmore received a score of 4 ("exceeding expectations"), Passmore received a 2 ("needs improvement") on all of the "core responsibilities." Concerning "behaviors," Heck rated Passmore a 5 ("greatly exceeds expectations") for being "persistent" and "opportunistic," but rated Passmore a 1 ("below standards") for each of the following categories: "proud/excellence," "trustworthy/respect," "accountability," and "customer first."

According to Heck, Passmore received the lowest talent review score of all of the district managers in the Nashville Division. Heck also claims that he sought input about who to fire from Steve Adcox, his Assistant Division Manager, as well as Mike Terrell, who Defendants claim was Mapco's Director of Loss Prevention but Passmore claims was DelekUS AML's Compliance Officer. Regardless, Terrell claims that Heck was wavering between terminating Passmore or another district manager, but Terrell told him to let Passmore go. This was because, while the other manager (whose name he did not recall during his deposition) was also under-performing, Heck's "shrink[3] performance was very, very poor." (Doc. No. 25-7, Terrell Depo. at 59). Terrell also believed that the other manager was already looking for a job and would probably leave of his own volition, whereas Passmore "would probably not leave voluntarily." (Id.).

Heck ultimately decided to eliminate Passmore's position and terminate his employment. Defendants claim Heck discussed his decision with Miller and Jennifer Boulton, who Defendants claim was Mapco's Vice President of Organizational Development at the time, but who Passmore

---

[2]EBITDA is an acronym for earning before interest, tax, depreciation, and amortization. (Doc. No. 25-4, Heck Depo. at 99).

[3] "Shrink" refers to the theft or loss of merchandise and cash at a store. (Doc. No. 25-7, Terrell Depo. at 59).

claims held that role as an employee of Delek. Both allegedly approved Passmore's termination.

On November 8, 2013, Boulton informed Passmore that he was being terminated because his position was being eliminated. Passmore admits that is what he was told, but claims it was a pretext used to fire him for unlawful reasons. In this regard, Passmore asserts that (1) the talent review was not signed and dated by Heck until November 20, 2013, weeks after the termination; (2) many of the numbers Heck used actually favored retaining Passmore over any of a number of the other District Managers; (3) Passmore received bonuses and awards shortly before he was fired; and (4) the day after his termination Wagner and Rakoczy were promoted to the position of division managers and the number of division managers increased from 9 to 10.

The parties' differences go far beyond those just recounted, but are more than enough to place their arguments in context. The issue becomes whether the differences are material and whether they require a jury trial on any one or more Passmore's claims.

## II. <u>Summary Judgment Standard</u>

As this Court has noted in the past, the standard governing summary judgment has been restated on countless occasions and is well known. It suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, <u>Van Gorder v. Grand Trunk W. R.R., Inc.</u>, 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003).

### III. Legal Analysis

Passmore brings both federal and state law claims. He alleges age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*. He also alleges retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the THRA,[4] and the Tennessee Public Protection Act ("TPPA"), Tenn. Code § 50-1-305.[5] Prior to reaching those claims, the Court must addresses whether Delek also employed Passmore, and whether Mapco underwent a reduction in force.

### A. Delek as an Employer

Passmore argues that both Delek and Mapco were his employers. That argument fails whether considered under the single employer/integrated enterprise, joint employer, or agency theories of liability.

"Under the 'single employer' or 'integrated enterprise' doctrine, two companies may be considered so interrelated that they constitute a single employer subject to liability under the ADEA and/or the ADA." Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993 (6th Cir. 1997). "In determining whether to treat two entities as a single employer, courts examine the

---

[4] "THRA claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases). This includes the McDonnell Douglas v. Green, 411 U.S. 792 (1973) burden-shifting framework that the Tennessee legislature codified for all claims filed after June 10, 2010. Tenn. Code Ann. § 4–21–311 (2011).

[5] In the controlling First Amended Complaint, Passmore also brought claims for a hostile work environment under Title VII and the THRA, as well as claims for wrongful termination and retaliation under Tennessee common law. He has voluntarily dismissed his hostile work environment claim (Doc. No. 24), and in his Sur-Reply concedes that his common law claims have "been preempted by state statutory law." (Doc. No. 45-1 at 1).

7

following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." Id. at 993-94; see N.L.R.B. v. Palmer Donavin Mfg. Co., 369 F.3d 954, 957 (6th Cir. 2004) (identifying those four factors as the "well-established criteria" for determining integrated enterprise status). Although "[n]one of these factors is conclusive, and all four need not be met in every case . . ., control over labor relations is a central concern." Id. (citing Armbruster v. Quinn, 711 F.2d 1332, 1336-37 (6th Cir. 1983)).

"The joint-employer and single-employer doctrines are analytically distinct." Sanford v. Main St. Baptist Church Manor, Inc., 449 F. App'x 488, 495 (6th Cir. 2011). "The joint-employer doctrine involves a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer; unlike in the single-employer context, the two businesses are in fact independent." Id. at 491. The Sixth Circuit has stated that "[w]hether a joint employer relationship exists depends upon 'such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions.'" N.L.R.B. v. Centra, Inc., 954 F.2d 366, 370 n.2 (6th Cir. 1992) (quoting W.W. Grainger, Inc. v. NLRB, 860 F.2d 244, 247 (7th Cir. 1988)). Similarly, the Sixth Circuit has indicated that joint employer status exists where "two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." Carrier Corp. v. N.L.R.B., 768 F.2d 778, 782 (6th Cir. 1985); see Elkin v. McHugh, 993 F. Supp. 2d 800, 806 (M.D. Tenn.

2014) (citation and internal quotation omitted) ("To be a joint employer, VII requires the two entities to share or co-determine those matters governing essential terms and conditions of employment. . . . The major factors are the authority to hire, fire, discipline, affect compensation and benefits, and direct and supervise performance.").

Finally, the "third approach examines whether the person or entity that took the allegedly illegal employment action was acting as the agent of another company, which may then be held liable as the plaintiffs' employer." Swallows, 128 F.3d at 993 (citing Deal v. State Farm Cty. Mut. Ins. Co. of Tex., 5 F.3d 117 (5th Cir. 1993)). "An agent is one who consents to act on behalf of another and subject to the other's control." Id. at 996 (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958)). "An agent within the context of the ADEA and other employment discrimination statutes must be an agent with respect to employment practices." Id.

Regardless of the theory used, the evidence before the Court establishes that Passmore was employed solely by Mapco, not by Mapco and Delek or some combination of the two. Mapco was a subsidiary of Delek until Mapco was sold in November 2016. During all relevant times, Mapco and Delek had different presidents. They also had separate bank accounts, capital structures, financial records, and employee payrolls. Although the two companies shared a common headquarters, Mapco owned and controlled all of its own real estate, equipment and supplies.

More specifically in relation to Passmore, the offer letter he received made clear that he was going to work for Mapco. It began by saying that the company was "excited about your decision to join us at Mapco Express," and continued on to point out that "Mapco Express has an excellent comprehensive medical and dental insurance plan." (Doc. No. 38-8 at 1). At the conclusion of the letter, Passmore evidenced his intent to work for Mapco Express by signing and dating the following

statement:

> I agree to the above terms of this offer of employment with MAPCO Express. I understand that this does not constitute an employment contract for any specific term, and does not alter the at-will nature of my employment with MAPCO Express.

(Id. at 2).

Furthermore, Passmore admitted in his deposition that he "was employed by Mapco Express," and acknowledged that the Position Overview for the District Manager position he held listed Mapco Express as the "appropriate company." (Doc. No. 25-3, Passmore Depo. at 30 and Exh. 4). All of the W-2 Wage and Tax Statements that Passmore received during his employment also identified Mapco Express as his employer. (Doc. No. 25-1 at 7-11).

"To make out a *prima facie* case of either . . . discrimination or retaliatory termination under Title VII, a plaintiff must first prove the defendant was h[is] employer." Knitter v. Corvias Military Living, LLC, 758 F.3d 1214, 1225 (10th Cir. 2014); see Tipton v. Northrup Grumman Corp., 242 F. App'x 187, 190 (5th Cir. 2007) (stating that plaintiffs have the "burden of coming forth with 'specific facts'" to establish that the parent company is an employer); Sanford, 449 F. App'x at 495 (observing that for purposes of satisfying the numerosity threshold for employer liability under Title VII, the employee has the burden of establishing single-employer doctrine). Although he raises a number of arguments, Passmore falls far short of carrying that burden in relation to Delek.

A lot of Passmore's arguments are based upon the mistaken contention that Boulton and Miller were Delek employees during the relevant period. He claims that "Human Resources was run by Jen Boulton, an employee of Delek," and that both she and Miller "worked for both companies," with Miller serving as Delek's Acting President when Passmore was fired." (Doc. No. 33 at 34-35). Both, allegedly, "had input into the decision to fire Plaintiff" and approved "the initial

hiring and promotions of Wagner and Rakoczy to district manager positions." (Id. at 36).

However, Boulton testified in her deposition that she went to work for Mapco as the Vice President of Organizational Development in May of 2011, and that a "[y]ear and a half to two years" before her deposition on January 17, 2017, she "moved officially from working for the legal entity of MAPCO, and . . . officially moved over to working for the legal entity of Delek US." (Doc. No. 25-6, Boulton Depo. at 7-8, 11). This suggests Boulton moved from Mapco to Delek in January 2015 at the earliest and was, therefore, was employed by Mapco at the time of the events giving rise in this suit. Passmore has not shown otherwise.

As for Miller, Passmore asserts that Miller testified in his deposition that he worked for Delek, not MAPCO, from 2009 onward. However, what Miller actually stated was that, even though he started working for Delek in 2009 as Vice President of Merchandising, he was the Acting President or President of "retail operations" at the time Passmore was fired, (Doc. No. 25-2, Miller Depo. at 4-5), meaning he held the role as an employee of Mapco. This is confirmed by the declaration of Amy Harrison, Senior Counsel for Delek US Holdings, who avers that, beginning in the Summer of 2013 and for the remainder of that year, Miller served as Mapco's President and was responsible for the day-to-day operations of that company. (Doc. No. 25-1, Harrison Decl. ¶¶ 8-9). Again, Passmore has not established otherwise.

Passmore also argues that in a 2013 Form 10-K filed with the Securities and Exchange Commission, Delek claimed "3,018 employees in its retail segment and stated these workers were employees of Delek." (Doc. No. 33 at 35). This, however, is too broad a reading of the 10-K. What it actually states is that, "[a]s of December 31, 2013, we had 4,366 employees, of whom 1,098 were employed in our refining segment, 124 were employed by Delek for the benefit of our logistics

segment, 3,018 were employed either full or part-time in our retail segment and 126 were employed at our corporate office," with the "we" referring to "Delek US Holdings, Inc. and its consolidated subsidiaries." (Doc. No. 38-1 at 3, 23). The Form 10-K also identifies MAPCO Express, Inc. as one of Delek's subsidiaries, and later indicates that the "retail segment" of Delek was operated under various names, including Mapco Express and Mapco Mart. (Id. at 2, 3, 17).

Passmore next argues that Delek and MAPCO used each other's letterheads and logos interchangeably and shared risk management functions, Delek's internal audit group audited Mapco's complaince program, and Delek and Mapco shared a common headquarters and employee handbook. He cites E.E.O.C. v. Dolphin Cruise Line, Inc., 945 F. Supp. 1550 (S.D. Fla. 1996) for the proposition that the use of shared logos/letterheads, offices and services are deemed to be a "strong indicia of interrelated operations." (Doc. No. 33 at 34-35). However, the court in Dolphin Cruise noted that there must be "sufficient indication that there is such active interrelationship between the entities that they can be regarded as a single employer of the charging party," and this determination must be based upon the "totality of the circumstances[.]" 945 F. Supp. at 1553. The totality of the circumstances in that case suggested a single employer because the following factors were also present: the sole owner of one company was also the president of both; lower level managers of both corporations assisted each other in the daily operations of the company; the parent company made employment decisions for both companies; and the companies were "marketed as twin operations," among many other things. Id. at 1554. See also Ahumada v. Belcher Mgmt., LLC, 2014 WL 2832674, at *5 (M.D. La. June 23, 2014) (finding that the parent company was not employer even though employee received documentation and policies under its letterhead when the decision was made by the subsidiary and employees paychecks came from the subsidiary); Ennis

v. TYCO Int'l Ltd., 2004 WL 548796, at *4 (S.D.N.Y. Mar. 18, 2004) (rejecting single employer doctrine even though plaintiff's business cards and letterhead indicated that Sontirol was a Tyco company, plaintiff was encouraged to mention that affiliation in sales pitches, the benefit plans were administered by Tyco, plaintiff agreed to abide by Tyco's employment guidelines manual, and Tyco advertised itself as an employer of more than 200,000 people worldwide, including Sonitrol employees).

As Passmore recognizes, the critical question is "what entity made the final decisions regarding employment matters related to the person claiming discrimination." Swallows, 128 F.3d at 995. "Essentially, this factor seeks to determine which entity has the power to hire and fire the employee." Lisenbee v. FedEx Corp., 579 F. Supp. 2d 993, 1002-03 (M.D. Tenn. 2008) (citation omitted). "Even if a parent company has some influence in certain employment decisions . . . the factor is not satisfied if it does not control 'those decisions in the manner seen in single employer situations.'" Id. (citation omitted)

Passmore has not shown that Delek hired him, that Delek made the final decision to fire him, or that there was centralized control of labor relations and personnel as between Delek and Mapco. As such, his claims against Delek are subject to dismissal because Delek was not his employer.

**B. Reduction In Force or "RIF"**

In addition to disputing who employed Passmore, the parties dispute whether he was terminated as a part of a reduction in force. The significance of this dispute lies in the fact that (as discussed below) the elements of a *prima facie* case of age discrimination under McDonnell Douglas Corp. v. Green differ depending upon whether there was a *bona fide* RIF.

"A work force reduction situation occurs when business considerations cause an employer

to eliminate one or more positions within the company." <u>Bell v. Prefix, Inc.</u>, 321 F. App'x 423, 428 (6th Cir. 2009). Although "[a]n employer need not dismiss any particular number of employees, or terminate a set percentage of the work force, to institute a reduction in force," <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 845 (1st Cir. 1993), "[a] RIF is not an open sesame to discrimination, <u>Matthews v. Commonwealth Edison Co.</u>, 128 F.3d 1194, 1195 (7th Cir. 1997), and thus "may not be used as a disguised adverse action to remove or demote a particular employee," <u>Gandola v. F.T.C.</u>, 773 F.2d 308, 312 (Fed. Cir. 1985).

The Sixth Circuit has "described the inquiry a court must undertake to determine whether an employee was terminated as part of a reduction in force:

> . . . 'An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'"

<u>Pierson v. Quad/Graphics Printing Corp.</u>, 749 F.3d 530, 537 (6th Cir. 2014) (quoting <u>Barnes v. GenCorp</u>, 896 F.2d 1457, 1465 (6th Cir.1990)).

Mapco insist that there was a valid RIF because it eliminated a district manager position in the Nashville Division, three district manager positions in the other divisions, and a loss prevention specialist position. That is, five positions were eliminated.

From Passmore's perspective there was no RIF. The day before he was terminated there were 9 district managers in Nashville and the day after there were 10 because Mapco promoted both Wagner and Rakoczy from their positions as DMITs.

The foregoing is a simplistic version of the parties's position on the question of whether there was a reduction of force. Despite the parties' wasting a great deal of ink on the issue, the Court

finds it unnecessary to spill more, other than to note two common sense observations. First, if there was not truly a RIF, Mapco undertook an elaborate ruse to manufacture one in an effort to get rid of Passmore for nonpretextual reasons. Second, if there was a legitimate RIF, one would expect the decision to be covered with paperwork in the form of emails, letters and/or corporate directive, yet the primary support for Mapco's contention is that Miller supposedly instructed Heck to eliminate a position in Nashville. Even then, Mapco does not rely on Miller for this assertion perhaps because his recollection (according to his deposition testimony) is sketchy at best. Nevertheless, it is unnecessary to determine whether this case should be analyzed as a RIF case because the result is the same either way: Passmore has failed to present a jury question on his age discrimination or TPPA claims, but he has provided sufficient questions of fact so as to warrant a jury trial on his retaliation claims under Title VII and the THRA.

## C. Age Discrimination

"Typically, to prove a prima facie case of age discrimination, an employee must demonstrate that '(1) he or she was a member of a protected age class (i.e., at least forty years old); (2) he or she suffered an adverse employment action; (3) he or she was qualified for the job or promotion; and (4) the employer gave the job to a younger employee.'" Pierson, 749 F.3d at 536 (quoting Blair v. Henry Filters, Inc., 505 F.3d 517, 529 (6th Cir. 2007)). "However, when an employee is terminated as part of a reduction in force, the employee must meet a heightened standard to prove his prima facie case: He must present 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [him] out . . . for discharge for impermissible reasons.'" Id. at 536-37 (quoting Barnes, 896 F.2d at 1465).

Whether a RIF case or not, when a plaintiff submits evidence from which a reasonable jury

could conclude that a prima facie case of discrimination has been established, "[t]he defendant must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action." Macy v. Hopkins Cty. Sch. Bd. of Educ., 484 F.3d 357, 364 (6th Cir. 2007) (citing Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1186 (6th Cir. 1996)). "If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." Id. "The plaintiff's burden to demonstrate pretext in the final step then 'merges with the ultimate burden of persuading the court that []he has been the victim of intentional discrimination.'" Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 812 (6th Cir. 2011) (quoting Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 256 (1981)). "In evaluating pretext and the plaintiff's ultimate burden, the court should consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." Id. (citing Peck v. Elyria Foundry Co., 347 Fed. App'x 139, 145 (6th Cir. 2009)).

If, as Mapco contends, there was a *bona fide* reduction in force, Passmore's age discrimination case fails at the *prima facie* stage. He does not argue, let alone point to any evidence, that would suggest Mapco singled him out for discharge because of his age. All he really argues is that he was 42 when fired, Wagner was 33 when he became a district manager, and an age difference of 6 ½ years "is sufficient to create an issue of material fact at the summary judgment stage." (Doc. No. 33 at 20 (citing Blizzard v. Marion Tech. Coll., 698 F.3d 275, 284 (6th Cir. 2012)). This is true enough but irrelevant in a reduction in force case because, by definition, the employee is not replaced. See Johnson v. Franklin Farmers Co-op., 378 F. App'x 505, 510 (6th Cir. 2010) (stating that in RIF, "[a]n employee is not replaced for purposes of the fourth element of a prima facie case of discrimination when another employee is assigned to perform the plaintiff's

duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work"); Schram v. Schwan's Sales Ent., Inc., 124 F. App'x 380, 384 (6th Cir. 2005) (observing that in "a true RIF, the ultimate question is whether [one employee] replaced [another]").

If, as Passmore contends, there was no true reduction in force, his age claims fail because Mapco has presented legitimate non-discriminatory reasons for termination, *i.e.* a division reshuffling or reorganization and alleged under-performance, and Passmore has not shown those reasons to be a pretext for *age* discrimination, or that those reasons did not actually or were not sufficient to motivate Mapco's decision, or even that they had no basis in fact. It is undisputed that, at the time of Passmore's firing, Heck was 40 years old, and in the protected class. It is also undisputed that Rakoczy, who was one of the DMIT's that became a division manager, was the same age as Passmore. And it is further undisputed that as of the time Passmore's termination, the ages of the remaining District Managers or DMITs in the Nashville Division were as follows: Ken Aggers (60), Tim Sprankle (55), Terry Cheffins (52), Mike Nelson (43), Bryan Quince (38), Michael Hurt (33), Jonathan Hutzel (33), Garrett Wagner (33), and Catherine Hart (32). In short, four district managers were older than Passmore, three significantly so. Passmore's termination based on age did a very poor job of lowering the average age of District Managers and DMITs.

In its memorandum, Mapco argues that "[n]o reasonable jury would ever believe that Heck, age 40, chose to terminate Passmore, age 42, on the basis of Passmore's age while four other district managers who were older than Passmore kept their jobs." (Doc. No. 26 at 14). Passmore's response does not address this argument and, other than to confirm that he brings age discrimination claims under both Title VII and the THRA, he does not even mention age discrimination in his sur-reply.

In his deposition, Passmore testified that the only basis for his age discrimination claim is the fact that he was over 40 at the time of his termination and that Wagner, his supposed replacement, was under 40. However, "the sole fact that he was replaced by a younger person is insufficient as a matter of law to raise a genuine dispute of material fact as to whether [Mapco's] nondiscriminatory reason for [firing] him was pretextual." <u>Tennial v. United Parcel Serv., Inc.</u>, 840 F.3d 292, 305-06 (6th Cir. 2016). In other words, "'[t]he isolated fact that a younger person eventually replaces an older employee is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination.'" <u>Hedrick v. W. Reserve Care Sys.</u>, 355 F.3d 444, 462 (6th Cir. 2004) (quoting <u>Chappell v. GTE Prod. Corp.</u>, 803 F.2d 261, 267 (6th Cir. 1986)). Summary judgment will be granted on Passmore's age discrimination claims.

**D. Retaliation Claims**

As with Passmore's age discrimination claims, his retaliation claims are analyzed under the burden shifting paradigm set forth in <u>McDonnell Douglas</u>. However, the essential elements of a *prima facie* case are different as between retaliation claims under Title VII and the THRA on the one hand, and the TPPA on the other. That difference affects the outcome of those claims and, accordingly, will be analyzed separately.

**A. Title VII and the THRA**

"The elements of a retaliation claim are similar but distinct from those of a discrimination claim." <u>Laster v. City of Kalamazoo</u>, 746 F.3d 714, 730 (6th Cir. 2014). "To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that: '(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal

connection existed between the protected activity and the materially adverse action.'" Id. (quoting Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007)).  For purposes of summary judgment, Mapco challenges only whether there was a causal connection between Passmore's protected activity and his firing.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation,"[6] and "[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).  The same holds true for retaliation claims under the THRA.  Goree v. United Parcel Serv., Inc., 490 S.W.3d 413, 440 (Tenn. Ct. App. 2015).

Mapco argues that the last instance of protected activity occurred on July 17, 2013, when Passmore allegedly refused to terminate an Egyptian employee for failing an anti-money laundering quiz because Passmore thought it was discriminatory.  Because this was almost four months before the termination, Mapco argues there was no temporal proximity and, furthermore, "'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.'" (Doc. No. 26 at 24 (quoting Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 550 (6th Cir. 2008)).

Recently, the Sixth Circuit observed that "[i]n some cases temporal proximity alone may be sufficient."  Savage v. Fed. Express Corp., 856 F.3d 440, 448 (6th Cir. 2017).  "Where the adverse employment action 'occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal

---

[6] "But for" causation is the same thing as "'because of,' 'by reason of,' or 'based on'" causation.  Gentry v. E. W. Partners Club Mgmt. Co., 816 F.3d 228, 235-36 (4th Cir. 2016).

connection for the purposes of satisfying a prima facie case of retaliation.'" Id. (quoting Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)). The Sixth Circuit went on to observe that it had "not considered any specific ceiling on the period of time that a court will consider sufficient to show temporal proximity," but had "found that a time period of a month or more may establish temporal proximity." Id. (citing Dye v. Office of the Racing Comm'n, 702 F.3d 286, 306 (6th Cir. 2012)) (finding that two months sufficient to show a causal connection); Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir. 2004) (stating that three months was "significant enough to constitute sufficient evidence of a causal connection").

The approximately four-month gap identified by Mapco is perhaps too long a time, standing alone, to show temporal proximity, but Mapco's argument does not take into account that Passmore lists a long litany of complaints about alleged discrimination against Middle-Easterners dating back to January 2013. Passmore also claims to have complained to Adcox in October 2013 about Heck's refusal to promote an employee to a manager slot because the employee was Egyptian, and that, less than a week before his termination, he complained about all of Heck's allegedly discriminatory acts to Brian Veasman, Mapco's Director of Operations.

Mapco shrugs off this evidence. For example, it claims the evidence relating to Veasman is irrelevant because he was not involved in the termination decision and because he claims not to have told Boulton about those complaints. However, Boulton testified in her deposition that Veasman was trained to bring reports about discrimination to Human Resources and that, in fact, it was his duty to forward such complaints to her. At the very least, this raises credibility issues and questions of fact regarding whether Veasman reported Passmore's complaint to Human Resources or Boulton, both of which are for the jury to decide.

Construing the facts in Passmore's favor, whether Mapco's stated reasons for discharge were a pretext for retaliation also raises questions of fact for the jury. Mapco's position throughout has been that there was a reduction in force and that Passmore was let go because he was the poorest performing division manager. As noted, however, whether a RIF occurred is hotly contested. Furthermore, for allegedly being an under-performer, Passmore was the subject of only one counseling form during his employment. He was never formally disciplined for poor job performance, nor was he the subject of a performance improvement plan under Mapco's progressive disciplinary system.

Moreover, for the months of August and September 2013, Passmore received bonuses, while many other district managers did not. In fact, only two of the eleven district managers received more in bonuses during this period than Passmore.[7] Passmore also did better than some of the other Division Managers in several of the categories assessed by Heck.

Additionally, during an October 24, 2013 divisional meeting, Passmore received an award for "Mi Tienda," a program he developed for attracting more ethnic customers to his store, and was also chosen with four others to be placed on Mapco's "Wall of Fame." The award read:

---

[7] Mapco objects to Passmore's identification of the bonuses received by the district manager because the documents on which they are based are not authenticated. This is an interesting argument to make since Passmore claims they are based on Mapco's own documents produced during discovery. Regardless, "Rule 56 no longer draws a clear distinction between authenticated and unauthenticated evidence for purposes of summary judgment." Mangum v. Repp, 674 F. App'x 531, 537 (6th Cir. 2017). On summary judgment, "[t]he question is not whether the [documents] have already been authenticated. Rather the issue is whether they can be presented in a form admissible at trial." Franklin Am. Mortg. Co. v. Chicago Fin. Servs., Inc., 145 F. Supp. 3d 725, 731 (M.D. Tenn. 2015) (citing Foreword Magazine, Inc. v. OverDrive, Inc., 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011)); see Fed. R. Civ. P. 56(c)(2) (emphasis added) ("A party may object that the material cited to support or dispute a fact *cannot be presented* in a form that would be admissible at trial").

TODD PASSMORE

This is in recognition of your personal commitment to owning the MY MAPCO state of mind.

You took the initiative to rollout and own the Hispanic program for the company. This has resulted in an increase of $300,000.00 in yearly sales. Your ownership of the business is the highest standards of the MY MAPCO mindset. I personally want to recognize and thank you for all your efforts.

Tony Miller
VP of Operations
Mapco Express

(Doc. No. 38-21 at 1).

Again, Mapco dismisses this evidence as not probative. It claims the Passmore's receipt of the Mi Tienda award "does not show that Mapco's reasons for selecting Passmore as the District Manager to divest were unworthy of credence," and, besides, the program "is no longer in existence." (Doc. No. 49 at 7). Maybe so, but giving Passmore an award that recognized a huge increase in sales, lauding his "high standards," and selecting him for the "Wall of Fame" less than a month before his termination at the very least presents a credibility question for the jury. (Doc. No. 41 at 10).

Further, the fact that Boulton testified bonuses were not necessarily based on a district manager's performance "but could depend on what was going on in a particular area. . . such as fuel pricing or a competitor shutting down across the street, (Doc. No. 49 at 7-8), does not rule out the possibility that Passmore actually received the bonuses for performance. As for non-receipt of progressive discipline, Mapco claims that there was discretion in the form the discipline imposed, but this argument does not negate the fact that Passmore received only one counseling.

Finally, Mapco argues that Heck rated Passmore lowest among the district managers, but

Heck is also the one who was the subject of Passmore's discrimination complaints. A jury could view Heck as biased, that he selected Passmore instead of any number of other managers because Passmore complained about him, and conclude that "the desire to retaliate was the but-for cause of the challenged employment action." Nassar, 133 S. Ct. 2528. Summary judgment is therefore not warranted on Passmore's claims for retaliation under Title VII and the THRA.

### B. TPPA

The TPPA is a "narrowly crafted exception to the long-established common law employment-at-will doctrine." Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 26 (Tenn. 2011). "[S]ometimes referred to as Tennessee's 'Whistleblower Act,'" the TPPA "'includes both (1) discharge in retaliation for refusing to remain silent about illegal activities . . . and (2) discharge in retaliation for refusing to participate in illegal activities.'" Williams v. City of Burns, 465 S.W.3d 96, 110 (Tenn. 2015) (quoting VanCleave v. Reelfoot Bank, 2009 WL 3518211, at *7 & n.3 (Tenn. Ct. App. Oct. 30, 2009)).

Like retaliation claims under Title VII and the THRA, the burden shifting framework is utilized, but with a notable difference. Unlike a THRA claim which requires only "but for" causation, "the TPPA requires the plaintiff to prove that retaliation for the protected conduct was the *sole* reason" for the adverse employment action. Id. (emphasis in original).[8]

---

[8] The Court recognizes that the but-for standard may be "only marginally more efficacious than the sole cause standard," Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 325 (6th Cir. 2012) (Clay, J. concurring), but "but-for cause" does not mean "sole cause," Leal v. McHugh, 731 F.3d 405, 415 (5th Cir. 2013). An employer may be liable under "but for" causation "if other factors contributed to its taking the adverse action, as long as [the protected conduct] was the factor that made a difference." Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278 (10th Cir. 2010). "Sole cause," on the other hand, is "[t]he only cause that, from a legal viewpoint, produces an event or injury." Leal, 731 F.3d at 415 (citation omitted). See Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 218 (4th Cir. 2016) (in Title VII retaliation case "plaintiff's burden is only to show that the

Leaving aside the apparent incongruity in claiming that age was a "but for" factor in the termination decision while at the same time arguing that the termination was based "solely" on the refusal to participate in illegal activity, Passmore has failed to meet the "high" bar and "stringent standard . . . for recovery," Sykes, 343 S.W.3d at 28, under the TPPA. Simply put, even after drawing all inferences in his favor, the record fails to establish that Passmore was "terminated solely for refusing to participate in . . . illegal activities[.]" Tenn. Code Ann. § 50–1–304(b).

In Williams, the Tennessee Supreme Court stated:

> In articulating a non-retaliatory reason for discharging the employee, the defendant employer in a TPPA case need not proffer evidence that unlawful retaliation was no part of its decision to terminate employment. Rather, the employer need only introduce admissible evidence showing that unlawful retaliation was not the sole cause of the employment action. That is, the employer must proffer evidence that, even if retaliation was a motivation for the discharge, there was at least one non-retaliatory reason as well.

465 S.W.3d at 115.

Clearly, Passmore believes he was a better and more productive manager than several–if not most–of the district managers that were retained, but "[a]n employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor." Stockman v. Oakcrest Dental Ctr., P.C., 480 F.3d 791, 802 (6th Cir. 2007); see Adams v. Tenn. Dep't of Fin. & Admin., 179 F. App'x 266, 272 (6th Cir. 2006) (court's role is not "to act as super personnel departments to second guess an employer's facially legitimate business decisions"). Regardless, Passmore's assertion that

---

protected activity was a but-for cause of her termination, not that it was the sole cause"); Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013) ("Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause.").

"[a]t least 4 districts performed worse than [his] on overages and shortages," and two districts performed worst [sic] than [his] district on both merchandise and cash overage and shortages," does not advance the ball in his favor because this means that the majority of districts managers performed better in those categories.

Further, it is undisputed that Passmore received a Coaching and Counseling Form on July 12, 2013 for "unacceptable behavior" relating to his employees' inability to pass the anti-money laundering test. It is also undisputed that, as a result, Passmore's district was prohibited from selling money orders until August 13, 2013. And, it is undisputed that he sent an email to Heck in August 2013, in which he indicated that his district was "not where [he wanted] it to be yet[.]" (Doc.No. 25-3, Passmore Depo. Exh. 49).

The Court could go on, but the point is that Mapco had plenty of reasons for its employment decision and Passmore cannot show that unlawful retaliation was the *sole* cause of his dismissal. See Jones v. City of Union City, 2015 WL 9257815, at *12 (Tenn. Ct. App. Dec. 17, 2015) (holding that where defendant "submitted evidence that [p]laintiffs were discharged for at least one legitimate, non-pretextual reason [it] thereby affirmatively negated the final element of the Plaintiffs' TPPA claim–sole causation" making summary judgment appropriate); Levan v. Sears Roebuck & Co., 984 F. Supp. 2d 855, 870-71 (E.D. Tenn. 2013) (denying summary judgment on plaintiffs' common law retaliation claim, but granting summary judgment on TPPA claim because plaintiffs could not "show an exclusive causal relationship between their protected activity and the adverse employment action").

## IV.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted with

respect to all of the claims against Delek, as well as Passmore's claims against Mapco for age discrimination and retaliation under the TPPA. The Motion will be denied with respect to Passmore's retaliation claims against Mapco under Title VII and the THRA.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE